UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DARYL G. EIDENIER,<br>   Plaintiff,<br><br> v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of<br>Social Security Administration,<br>   Defendant. | )<br>)<br>)<br>) CAUSE NO.: 1:20-CV-277-JPK<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

  This matter is before the Court on a Complaint [DE 3], filed by Plaintiff Daryl G. Eidenier, and Plaintiff's Opening Brief [DE 24]. Plaintiff requests that the decision of the Administrative Law Judge denying his claim for disability insurance benefits be reversed and remanded for an award of benefits or, in the alternative, for a new hearing. For the following reasons, the Court remands this matter for further administrative proceedings.

**PROCEDURAL BACKGROUND**

  On November 24, 2017, Plaintiff filed an application for disability insurance benefits, alleging disability as of August 1, 2009. The application was denied initially and on reconsideration. Plaintiff requested a hearing, which was held before an Administrative Law Judge (ALJ) on July 10, 2019. On September 13, 2019, the ALJ issued an unfavorable decision, making the following findings:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.
>
> 2. The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of August 1, 2009 through his date last insured of December 31, 2014.
>
> 3. Through the date last insured, the claimant had the following severe impairments: cervical and lumbar degenerative disc disease with history of cervical fusions at C4-5 and C6-7, degenerative disc disease of the thoracic spine, post-

traumatic stress disorder (PTSD), depression, degenerative changes to the bilateral shoulders, left cubital tunnel syndrome, and carpal tunnel syndrome.

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the [ALJ found] that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could have stood and/or walked for six hours and could have sat for six hours and could never have climbed ladders, ropes, or scaffolds. The claimant could have occasionally climbed ramps and stairs, and could have occasionally balanced, stooped, knelt, crouched, and crawled. He could have performed occasional overhead reaching with the bilateral upper extremities and could have performed frequent reaching in all other directions. The claimant could have frequently handled and fingered with his non-dominant upper extremity. He could have performed simple, routine, and repetitive tasks with no production rate pace-like assembly-line work, with only occasional simple work-related decision-making. The claimant could have maintained attention and concentration for two-hour segments. He could have responded appropriately to occasional, predictable changes in the workplace. The claimant could have had occasional interactions with supervisors apart from what was necessary for general instruction, task completion, or training, and could have had occasional interactions with coworkers and the general public. The claimant could not have performed tandem tasks.

6.      Through the date last insured, the claimant was unable to perform any past relevant work.

7.      The claimant was born [in 1967] and was 47 years old, which is defined as a younger individual age 18-44, on the date last insured. The claimant subsequently changed age category to a younger individual age 45-49.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

    11.    The claimant has not been under a disability, as defined in the Social Security Act, at any time from August 1, 2009, the alleged onset date, through December 31, 2014, the date last insured.

(AR 15-25[1]).

The Appeals Council declined to assume jurisdiction, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the Agency's final decision. 42 U.S.C. § 405(g). The question before the Court is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). Under § 405(g), the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*,

---

[1] Page numbers in the Administrative Record (AR) refer to the page numbers assigned by the filer, which is found on the lower right corner of the page, and not the page number assigned by the Court's CM/ECF system.

641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). However, "if the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record and "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether a claimant is disabled: (1) whether the claimant has engaged in substantial gainful activity since the alleged onset of disability, (2) whether the claimant has a medically determinable impairment or combination of impairments that is severe, (3) whether the claimant's impairment or combination of impairments meets or medically equals the criteria of any presumptively disabling impairment listed in the regulations, (4) if the claimant does not meet a listing, whether he is unable to perform his past relevant work, and (5) if the claimant is unable to perform past

relevant work, whether he is unable to perform any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

Prior to step four, the ALJ determines the claimant's residual functional capacity (RFC), which "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). An affirmative answer at either step three or step five leads to a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 524 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

## ANALYSIS

Plaintiff asserts that (1) the RFC was flawed because it did not include a limitation relating to cervical movement and allowed for "frequent" handling and fingering; and (2) the ALJ's finding at step five was not supported by substantial evidence. The Court addresses the arguments in turn.

### A. RFC

At step two, the ALJ found that Plaintiff suffered from two "severe impairments" relating to his back: cervical and lumbar degenerative disc disease with history of cervical fusions at C4-5 and C6-7, and degenerative disc disease of the thoracic spine. (AR 17). Plaintiff first argues that the RFC did not adequately address his back problems because it did not include a limitation relating to cervical flexion, extension, or rotation.

In forming the RFC, the ALJ considered the medical evidence of Plaintiff's back conditions at length. She summarized findings indicating that Plaintiff consistently reported back and neck pain, with limited range of motion, and imaging reports showing mild degeneration of Plaintiff's spine. (AR 21 citing AR 293, 298-300, 307-312, 400-417, 647). The ALJ also considered the

5

opinions of two reviewing state agency doctors, and two consultative examiners who examined Plaintiff personally. All four doctors considered Plaintiff's history of back issues and recommended corresponding limitations, although none recommended a limitation specific to cervical movement. (AR 70-73 (M. Brill), 87-90 (M. Ruiz), 293-96 (Vijay Kamineni), 308-311 (B. T. Onamusi). No other medical opinions were presented. Ultimately, the ALJ found that "[g]iven the claimant's observed physical deficits, continued pain symptoms, and multi-level degenerative disc disease findings," he should be limited to sedentary work with some postural limitations. (AR 22). These limitations were ultimately more restrictive than those suggested by the doctors. *See id*.

Plaintiff first argues that because the ALJ acknowledged his back conditions as "severe impairments" at step two, the absence of a specific cervical limitation contradicts that finding, because it implies that these impairments did not affect his ability to work. Pl. Br. (ECF 24) at 9-12[2]; *see* 20 C.F.R. § 404.1520(c) (a "severe impairment" is one that "significantly limits your physical or mental ability to do basic work activities"). But the ALJ did include many limitations explicitly linked to his back issues, in the form of sedentary work plus limitations on climbing, balancing, stooping, kneeling, crouching, crawling, and reaching. (AR 20). Although Plaintiff disagrees with the scope of the limitations, the ALJ's findings are entirely consistent with her step two finding that Plaintiff's back conditions were severe impairments.

More importantly, the medical opinions either supported the ALJ's restrictions or recommended looser restrictions than the ALJ imposed. All four doctors acknowledged Plaintiff's cervical pain and range of motion issues, but all of them concluded that he could do at least

---

[2] The pages of Plaintiff's opening brief are misnumbered, with the first page labeled as page 5; when citing to Plaintiff's opening brief, the Court will refer to the page numbers generated by CM/ECF, which are found in the header at the top of each page.

sedentary work, and none of them concluded that he needed this additional limitation. For example, Dr. Onamusi examined Plaintiff and specifically noted limited range of motion in the areas of cervical flexion, extension, and torsion (AR 309, 311), but concluded that he could still do "light physical demand level activities" as defined in the Dictionary of Occupational Titles[3]. (AR 310). Given that these doctors specifically considered the implications of Plaintiff's cervical limitations, and in the absence of medical opinion to the contrary, the ALJ was justified in relying on their opinions. "When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

Next, Plaintiff argues the ALJ should have imposed greater restrictions on Plaintiff's handling and gripping. At step two, the ALJ found Plaintiff's left cubital tunnel syndrome and carpal tunnel syndrome to be severe impairments. (AR 17). At step three, she discussed the corresponding medical evidence, noting that Plaintiff underwent surgery to his left arm and wrist in May 2016, after the date last insured of December 31, 2014. (AR 22). Medical records prior to the date last insured were sparse and indicated mild findings and conservative treatment to his left arm and wrist. (*Id*. citing AR 838, 874, 910). Based on this record, and particularly the absence of records showing severe limitations during the time Plaintiff was insured, she found Plaintiff's impairments could be accommodated by a limitation to "frequent" handling and fingering with his non-dominant arm[4]. *Id.* This was again more restrictive than any of the doctors recommended, in

---

[3] "Light" work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

[4] The Court infers that the "non-dominant arm" refers to Plaintiff's left arm, the arm that required surgery.

part because the examining doctors' opinions had been issued before Plaintiff had his surgery. (See AR 23, 293, 308).

Plaintiff argues that the RFC limitations were inadequate, but he cites to no evidence that the ALJ failed to consider.[5] While Plaintiff believes the ALJ should have given more significance to the surgery after the period of insurance, that alone is not a basis for remand, because the ALJ considered that evidence and explained why she did not see it that way. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (an ALJ must consider post-dated evidence, but should weigh its relevance to the period at issue). The ALJ built a logical bridge from the limited records regarding Plaintiff's gripping and handling prior to the date last insured, to a conclusion that comported with the evidence from that period and remains uncontroverted by any medical opinion in the record. *Knox v. Astrue*, 327 F. App'x 652, 657-58 (7th Cir. 2009). The Court will not re-weigh the evidence or substitute its own judgment. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

### B. Step 5 Analysis

Plaintiff also takes issue with the ALJ's findings at step five. Specifically, he argues that the methodology used by the vocational expert to estimate the number of jobs available to Plaintiff was flawed; that the expert misidentified some of the jobs that were supposedly available to Plaintiff; and that the total estimated number of jobs available (120,000) was not "significant." The Court addresses only the methodology argument because that issue compels remand.

At step five, if an individual is to be found not disabled, the ALJ must demonstrate that there are a significant number of jobs in the national economy the claimant can perform. 20 C.F.R.

---

[5] In support of this argument, Plaintiff cited to two pages in the administrative record. Pl. Br. at 13 (citing AR 314, 357). Both pages discuss the pre-operation and post-operation procedures for his 2016 surgery. The ALJ discussed this surgery (AR 22), and Plaintiff does not describe how these pages support greater limitations than the RFC.

8

§ 416.960(c); *Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018). The ALJ must support the step five conclusion with "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The testimony of a vocational expert ("VE") can count as substantial evidence, based on factors such as the expert's credentials, qualifications, and experience, and the content and clarity of the testimony. *Id.* The ALJ is entitled to rely on a VE's testimony unless the claimant objects to it at the hearing. *Mitchell v. Kijakazi*, No. 20-2897, 2021 WL 3086194, at *3 (7th Cir. July 22, 2021); *Coyier v. Saul*, 860 F. App'x 426, 428 (7th Cir. 2021). A claimant objecting to the VE's estimate of jobs in the national economy must make a specific objection and "develop an argument or question the VE [ . . . ] about [the] methodology." *Coyier*, 860 F. App'x at 428. If an appropriate objection is made, the substantial evidence threshold requires the ALJ to "ensure that the approximation is the product of a reliable method." *Brace v. Saul*, 970 F.3d 818, 821 (7th Cir. 2020) (quoting *Chavez*, 895 F.3d at 968). This inquiry is made on a case-by-case basis, weighing whatever "markers of reliability" appear in the record to determine whether the testimony qualifies as substantial evidence. *Biestek*, 139 S. Ct. at 1157.

This case reflects an ongoing discussion among courts in the Seventh Circuit about how availability of jobs is estimated. ALJs and VEs typically refer to specific jobs by the names and numbers identified in the Dictionary of Occupational Titles ("DOT"), published by the Department of Labor. For example, within Standard Occupational Classification ("SOC") code 313 ("Chefs and Cooks, Hotels and Restaurants"), there are 25 different occupations with unique DOT codes (*e.g.*, 313.381-010 ("BAKER"); 313.381-014 ("PIZZA BAKER"); 313.381-018 ("PASTRY COOK APPRENTICE")).[6] The DOT describes job duties and requirements but does not indicate

---

[6] *See* https://occupationalinfo.org/defset5_2413.html (last visited January 18, 2022).

the prevalence of those jobs within the national economy. A separate publication, the Department of Labor's compilation of Occupational Employment Statistics[7], provides estimates about the prevalence of certain jobs, but classifies jobs more broadly than the DOT code. The upshot is that VEs often must estimate how many specific positions are available based on estimates of broader categories. *See Chavez*, 895 F.3d at 965-66.

Two methods of estimation have attracted particular attention within Seventh Circuit case law. One is the "equal distribution" method, which assumes that if there are a certain number of jobs within a particular SOC category, those jobs are spread equally among the various DOT jobs that make up that category. The Seventh Circuit has criticized this approach:

> [I]t does not take much knowledge of job markets to know that, while certain jobs may exist in large numbers (for example, a "pizza baker," DOT 313.381-014, who "prepares and bakes pizza pies"), others clearly do not (such as a "chef de froid," DOT 313.281-010, who designs "artistic food arrangements for buffets in formal restaurants" including "mold[ing] butter into artistic forms"). Or, by way of a second example, take "Cashiers and Tellers" [. . .] Of the 28 positions included in that group, six exist only in the racing industry, with five of those six existing only at horse-racing tracks. It seems unlikely that over 20% of all cashier and teller jobs in today's economy are at racetracks.

*Id*. at 966 (citation omitted) (listing cases). However, the Seventh Circuit has not conclusively rejected the approach as unreliable. *Coyier*, 860 F. App'x at 428 (7th Cir. 2021) (holding that *Chavez* "did not enjoin the use of the equal-distribution method"). VEs have also used a statistical database, Job Browser Pro (also known as "SkillTRAN," the name of the company that produces it), which estimates employment numbers and "[cross-references] to all major national occupational coding systems."[8] Although SkillTRAN appears to be a commonly used database, the ALJ must still elicit "substantial evidence" showing that the way the VE used the program was reliable. *See Dawn L. C. v. Comm'r of Soc. Sec.*, No. 3:20-CV-00626-GCS, 2021 WL 4488421, at

---

[7] *See* https://www.bls.gov/oes/tables.htm (last visited January 18, 2022).
[8] *See* https://skilltran.com/index.php/products/pc-based-solutions/job-browser-pro (last visited January 18, 2022).

*6-7 (S.D. Ill. Sept. 24, 2021) (compiling numerous cases discussing vocational experts' use of SkillTRAN). The VE does not have to "reveal the precise mechanics and statistical model involved," *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020), but must "provide some modicum of confidence in its reliability." *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020).

In this case, the VE identified three examples of jobs that Plaintiff could do considering his RFC: Polishing Machine Operator (29,000 jobs in the national economy), Sorting Machine Operator (22,000 jobs), and Wire Insulator (16,500 jobs). (AR 53-54). The VE estimated that there were 120,000 jobs, in total, that Plaintiff could perform in the national economy. *Id*. Questioned by Plaintiff's counsel and the ALJ regarding the methodology he used, the VE testified as follows:

> [Plaintiff's counsel]: All right, and what methodology do you use to get from the Bureau of Labor Statistic numbers to the national numbers for job classifications?
>
> [VE]: Well, two main statistical sources I use are SkillTRAN, Job Browser Pro, as well as United Statistical Publishing. There is no source that collects job incidence numbers directly by DOT code, so basically it's just an estimate of the number of DOT codes from occupational information gathered for a larger code.
>
> P: Okay, so they don't use any certain mathematical equation or equal distribution that you know of?
>
> VE: Well, it's going to -- it varies some depending on the number of DOT codes within the, you know, SOC code or census code. But in general it is, you know, simply looking at the -- well, the way they collect the information is simply looking at the numbers and dividing it by the number of DOT codes.
>
> P: Okay, but that's done by those applications, not, you don't have to do any of that yourself.
>
> VE: Well, I make some adjustment to the numbers, sure, based on, you know, looking at -- like for example, you know, DOT codes within a specific larger code, I mean, there might be jobs that, you know, I think like don't exist, for example, like, you know, Microfilm Document Preparer. Not that there are none, but there certainly aren't as many as they were, you know, 10 or 20 years ago.
>
> P: Sure. Do you have a certain mathematical equation that you use to apply in those situations?
>
> VE: Not a certain general one, no.

> . . .
>
> [ALJ]: Do other vocational experts use those two, Skill Browser and United Statistical Publication?
>
> VE: They do, yes, the same sources I cite.

(AR 58-59). Plaintiff objected to the VE's testimony, arguing that in effect, the VE used the equal distribution method, and therefore the estimate was not reliable.[9] The ALJ overruled the objection, finding that the VE's "job information" was reliable based on his experience, professional knowledge, and reliance on recognized sources.[10] (*See* AR 25-26). Plaintiff now repeats the same argument here. The Commissioner responds that the equal distribution method has not been fully rejected by the Seventh Circuit, that the VE did not use the method because SkillTRAN does not rely on that approach, and that many courts have approved VE estimates that relied on SkillTRAN.

Although the Commissioner asserts that SkillTRAN does not rely on the equal distribution method[11], the VE seemed to suggest that it did, or that he was unaware whether it did. (AR 59 ("But in general it is, you know, simply looking at the -- well, the way they collect the information is *simply looking at the numbers and dividing it by the number of DOT codes*.") (emphasis added)). In a recent case in this district, the court observed that U.S. Publishing, the other source mentioned in the VE's testimony, likely uses equal distribution for its estimates. *See Jones v. Saul*, No. 1:19-CV-494-PPS, 2021 WL 100357, at *3 (N.D. Ind. Jan. 12, 2021). The VE did not explain this point

---

[9] At the hearing, Plaintiff specifically based his objection on *Alaura v. Colvin*, 797 F.3d 503 (7th Cir. 2015), in which the Seventh Circuit described the equal distribution method as "preposterous" and any estimate relying on it as "likely to be a fabrication." *Id.* at 508. Plaintiff appeared to assume, based on the VE's testimony, that the equal distribution method was used. *See* (AR 58-59). The Court's basis for remand is not premised on that assumption. Nonetheless, remand is appropriate because the objection itself triggered the ALJ's broader obligation to "ensure that the approximation is the product of a reliable method." *See Brace*, 970 F.3d at 821-23.

[10] For example, the ALJ found that the VE properly relied on "job information available from various governmental and other publications." (AR 26). The ALJ's reasons will be discussed more fully below.

[11] Resp. Br. at 12-13, citing *Chavez*, 895 F.3d at 966 (describing SkillTRAN as an example of the "occupational density method," distinct from equal distribution)); *see also Dawn L. C.*, 2021 WL 4488421, at *6.

any further, so it remains unclear what method was used. And while the VE suggested that he tweaks the final numbers because there "might be" jobs that are now obsolete, it is unclear if any such adjustments were made in Plaintiff's case.[12] Instead, it appears that the ALJ and VE assumed any method based on SkillTRAN would be self-evidently reliable – that is, the "agency [took] a 'trust me' approach rather than – as required by the statute and regulations – carrying its burden" to show the method was reliable. *Jones*, 2021 WL 100357, at *3 (quoting *Brace*, 970 F.3d at 823).

The Commissioner notes that courts have repeatedly "upheld a VE's reliance on SkillTRAN software." (Resp. Br. at 12). But this misstates the ALJ's burden: "[T]he issue here is not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden." *Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169, at *12-14 (E.D. Wis. Sept. 24, 2021). Certainly, a VE's use of SkillTRAN can contribute to a finding of substantial evidence when supported by a clear explanation, which does not have to be a statistical treatise. *See, e.g., Bruno*, 817 F. App'x at 243 ("Although the VE's description did not reveal the precise mechanics and statistical model involved [with SkillTRAN], it nevertheless constitutes a 'reasoned and principled explanation.'"); *Khuzaie v. Comm'r of Soc. Sec.*, No. 1:14-CV-00199-SLC, 2016 WL 1253537, at *11-15 (N.D. Ind. Mar. 30, 2016).

But in a case like this, when the explanation is unclear and leaves doubt about the method used, the mere fact that SkillTRAN was used is not itself substantial evidence of reliability. *See, e.g., Hood v. Saul*, No. 1:19-CV-370-TLS, 2021 WL 5002717, at *4 (N.D. Ind. Oct. 28, 2021)

---

[12] The ALJ downplayed the importance of the estimates for each of the three jobs, because they were merely representative jobs among the pool of potential jobs available. (AR 26). But the VE testified that there would be "about 120,000 total" jobs in the national economy for Plaintiff, and the three selected jobs accounted for 67,500 of those jobs. (AR 53-54). It appears that the reliability of estimates for the individual jobs could have a significant influence on the total number of jobs.

("Stating that SkillTRAN 'looks at the percentages' does not 'cogently and thoroughly' explain the methodology of how the job number estimates were obtained."); *Maples v. Saul*, No. 1:20-CV-157-PPS, 2021 WL 1291766, at *4-6 (N.D. Ind. Apr. 7, 2021); *Jones*, 2021 WL 100357, at *3; *Westendorf v. Saul*, No. 19-CV-1019-JDP, 2020 WL 4381991, at *3-4 (W.D. Wis. July 31, 2020) ("Job Browser Pro might be a useful tool, but the VE needs to be able to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable.").

The Court does not necessarily accept Plaintiff's argument that the equal distribution method, and any variations of it, are irredeemably flawed. Rather, the problem here is that the VE's testimony was "neither cogent nor thorough," and the method he used remains unclear; therefore, there is not substantial evidence that the estimate was reliable. *Brace*, 970 F.3d at 822 ("The very existence of this debate [over the method used] confirms our conclusion that the VE's testimony does not satisfy the substantial-evidence standard."). With due recognition of the efforts of the ALJ and VE, this requires remand.

### C. Request for Award of Benefits

Plaintiff requests that the Court reverse and remand for an award of benefits or, in the alternative, for a new hearing. "Courts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). Nonetheless, "[a]n award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.* at 415. Since the basis for

remand does not make clear that Plaintiff is disabled, an award of benefits would not be appropriate.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the alternative relief sought in Plaintiff's Opening Brief [DE 24], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

So ORDERED this 19th day of January, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT